CLIFF PAPER CO. *v.* UNITED STATES (No. 1099).[1]

1. SECTION 2 (WOOD PULP), ACT OF JULY 26, 1911.

The sections of the Canadian reciprocity act are separable both in form and in character. The act contains no words that specifically or impliedly make the operation of section 1 dependent upon the operation of section 2 or the operation of section 2 dependent upon the operation of section 1, and section 2 is valid and in force.

2. SAME.

The words in this section that affix a condition precedent make the condition applicable to the given, specific, particular importation, and not to any and all possible importations similar in character from any other part of the Dominion of Canada.

3. SAME, AND THE GOODS HERE.

The wood pulp of this importation and the pulp wood from which it was manufactured were entitled to exportation from Canada into the United States free of any export charge or prohibition or restriction upon exportation; and it accordingly falls directly within the provisions of section 2 of the act and is thereby entitled to free entry.

United States Court of Customs Appeals, May 12, 1913.

APPEAL from Board of United States General Appraisers, G. A. 7423 (T. D. 33141).

[Affirmed.]

*Frederic B. Jennings* for appellant.
*William L. Wemple*, Assistant Attorney General, for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

This case relates to an importation made on May 7, 1912, from Canada at the port of Niagara Falls, of 600 bundles of unbleached chemical wood pulp, which was manufactured in Canada from pulp wood cut on private lands.

The importation upon its exportation from Canada was free from any export charge or any prohibition or restriction of exportation, and the right to like free exportation was possessed by the pulp wood from which the imported merchandise had been manufactured.

The entry was admitted free of duty by the collector in conformity with the interpretation which had been placed by the Treasury Department upon section 2 of the reciprocity act, which ruling of the department was published on July 26, 1911, as T. D. 31772. The act of Congress which is referred to is entitled "An act to promote reciprocal trade relations with the Dominion of Canada, and for other purposes." (62d Cong., Sess. I, ch. 3, July 26, 1911.)

The following is a copy of section 2 of the act just cited:

SEC. 2. Pulp of wood mechanically ground; pulp of wood, chemical, bleached, or unbleached; news print paper, and other paper, and paper board, manufactured from mechanical wood pulp or from chemical wood pulp, or of which such pulp is the com-

---

[1] Reported in T. D. 33435 (24 Treas. Dec., 764).

ponent material of chief value, colored in the pulp, or not colored, and valued at not more than four cents per pound, not including printed or decorated wall paper, being the products of Canada, when imported therefrom directly into the United States, shall be admitted free of duty, on the condition precedent that no export duty, export license fee, or other export charge of any kind whatsoever (whether in the form of additional charge or license fee or otherwise), or any prohibition or restriction in any way of the exportation (whether by law, order, regulation, contractual relation, or otherwise, directly or indirectly), shall have been imposed upon such paper, board, or wood pulp, or the wood used in the manufacture of such paper, board, or wood pulp, or the wood pulp used in the manufacture of such paper or board.

The appellant protests against the action of the collector, and contends that the merchandise was dutiable at one-sixth of 1 cent per pound under paragraph 406 of the tariff act of August 5, 1909.

It is conceded that the importation was liable to duty under that paragraph unless the same was exempted therefrom by the terms of section 2 of the reciprocity act as above copied. Therefore the entire issue in the present case is presented by the questions whether or not that section has become operative, and whether or not, if thus operative, the section comprehends within its purview such an importation as that at bar.

The appellant first maintains that section 1 of the reciprocity act has not become operative, and can not become operative until Canada shall enact the reciprocal legislation required by that section and the President shall make proclamation to that effect; and that section 2 of the same act was not intended by Congress to come into operation until section 1 should first become operative upon such reciprocal legislation and proclamation. Appellant contends that the two sections of the reciprocity act are but parts of a general scheme of reciprocity between the two countries; that the entire scheme has failed for lack of reciprocal action by Canada; and therefore that section 2, like the remainder of the act, is left without present effect or operation.

The answer to this contention is found in the fact that the several sections of the reciprocity act are separable both in form and character. This fact is made evident by the history and terms of the legislation. In the original bill as first introduced in Congress the paper and pulp provisions were items of a schedule of articles which were designated for reciprocal free admission into the respective countries. The provisions of the original bill governing that schedule were inseparable and were not to become operative until reciprocal action should be taken by Canada and the President of the United States should make proclamation to that effect. But afterwards the provisions for paper and pulp were withdrawn from the schedule to which they first belonged, and were enacted as a separate section of the act. It seems clear that this action was designed for the purpose of making the separated provisions independent of each

other. The following statement, taken from appellant's brief, comes near to the foregoing view:

Subsequently the provisions in respect to paper and pulp were taken out of section 1 and put by themselves in section 2, because otherwise none of the reciprocal legislation could have taken effect until all the provincial restrictions upon the export of wood were removed which, as pointed out in the trade agreement, could not be controlled by Canada.·

According to this statement from appellant's brief the paper and wood pulp provisions were taken from section 1 and enacted as section 2 in order to permit section 1 to become operative regardless of the operation of section 2.

If therefore Congress intended to permit section 1 to become operative independently of section 2, it is reasonable to conclude that section 2 might likewise become operative independently of section 1. The act as adopted contains no words which specifically or impliedly make the operation of either section dependent upon the operation of the other. The conditions upon which each section shall become operative are specifically set out in the section itself, and no requirement appears in either section for the concurrent operation of the other.

The conclusion just stated leads next to a consideration of the condition precedent contained in section 2, in order to determine its effect with relation to the present importation.

Appellant contends that the condition precedent of section 2 was adopted by Congress with reference to the fact that certain Canadian Provinces were prohibiting or restricting the exportation to this country of pulp wood growing upon Crown lands, and that Congress intended that the section should not become operative until all such prohibitions or restrictions should first be rescinded or repealed by those Provinces. Appellant furthermore contends that section 2, if it becomes operative, would continue in operation only so long as the enumerated paper, wood pulp and pulp wood are each and all allowed free and unrestricted exportation into the United States from all parts of Canada; and that the section if once operative would become inoperative so soon as any Province of Canada restricts in any manner the exportation into this country of any one of the enumerated articles, wholly regardless of the action of the other Provinces respecting any or all of those articles, and also regardless of the action of the given Province respecting the other enumerated articles. According to this construction the entire section would be inoperative or would become so if New Brunswick, for example, should restrict in any manner the exportation to this country of any part of the pulp wood growing in that Province, or the wood pulp manufactured therefrom, even though at the same time all other Canadian Provinces, in reliance upon section 2, should permit the

frcc exportation into this country of all pulp wood growing in such Provinces, and also of all wood pulp manufactured therefrom. Furthermore, according to appellant's contcntion, if Canada and all of thc Provinccs, in reliance upon scction 2, should permit the free exportation into the United States of pulp wood and wood pulp from every part of the Dominion, but if the Provincc of New Brunswick, for example, at the same time should restrict in any manner the exportation from that Province into thc United Statcs of the kind of paper named in the section, the entire section would be inopera- tive, or would become inoperative, if already in effcct. This propo- sition is stated by appellant in the following words.

Therefore, if the export of *any* paper, pulp or board of the kinds specified is pro- hibited or restricted in any way by Canada, no paper, pulp or board can be admitted to this country free. If any prohibition or restriction is put by Canada upon the export of any pulp of any of the kinds specified, no paper can be admitted free. If any prohibition or restriction is put by Canada upon the export of any paper of any of the kinds specified, no other paper and no pulp can be admitted free.

The references to Canada which appear in the foregoing quotation are of course intended to include the Canadian Provinces.

Accordingly appellant contends that the present importation is not entitled to free entry into this country under section 2, because the section, thus construed, is totally inoperative, since some of the Provinces of Canada continue to prohibit or restrict the exporta- tion into this country of pulp wood cut from Crown lands.

This contention of appellant, like that first considered, leads to a review of the legislative history of the enactment. This history begins with the trade agreement which was concluded between the Secretary of State and the Canadian ministers. That agreement con- templated reciprocal legislation by the two countries, whereby certain articles should reciprocally be admitted into both countries free of duty, and other articles should reciprocally be admitted into both countries at the same rates of duty, and yet other articles should reciprocally be admitted into each country at certain prescribed rates of duty.

As proposed by the agreement certain kinds of paper and wood pulp were included within the schedule of articles designated for reciprocal free entry. It was stipulated upon the part of the United States that such paper and wood pulp should have free entry into this country from Canada, subject to the condition precedent that no charge, prohibition, or restriction shall have been imposed upon the exportation of such paper or wood pulp, or upon the wood used in the manufacture of such paper or wood pulp; and subject also to the condition precedent that Canada should reciprocally give free entry to such paper and wood pulp from the United States. Upon the part of Canada, however, it was stipulated that such paper and

wood pulp should be admitted free of duty from the United States into Canada only when such paper and wood pulp are admitted free of duty into the United States *from all parts of Canada.*

The reciprocity act as first introduced in the Sixty-first Congress conformed in the foregoing particulars to the terms of the diplomatic agreement. . The paper and wood pulp provisions appeared in the schedule of articles which were to be reciprocally free of duty. The paper and wood pulp were to be admitted without duty from Canada into the United States upon condition that no charge, prohibition, or restriction of exportation shall have been imposed upon such paper and wood pulp, or upon the pulp wood used in the manufacture of such paper or wood pulp. And in common with the other items of the free schedule the paper and wood pulp provisions were not to become operative until the President of the United States should have satisfactory evidence and make proclamation that the same articles had reciprocally been granted free entry from the United States into Canada.

The reciprocity act, however, was not adopted in the form in which it was thus first introduced. At the Sixty-first Congress the paper and wood pulp provisions were amended in the House; the bill as thus amended was adopted by the House, but failed of enactment in the Senate. At the special session of the Sixty-second Congress, which was thereupon called by the President for the express purpose of considering the reciprocity agreement, the act was finally adopted in the form in which it had passed the House at the preceding session. In the act as thus adopted Congress separated paper and wood pulp from the other items of the free schedule, and enacted the provisions relating to them as an independent section of the act. The operation of that section was not made dependent upon reciprocal free admission by Canada of such paper and wood pulp when imported from the United States, nor was it required that the President of the United States should ascertain or make proclamation of any action on the part of Canada or the Canadian Provinces as a condition precedent to the operation of the section. Congress thus struck out all conditions preliminary to the free admission into this country of the enumerated paper and wood pulp except only the express condition precedent contained in the section.

This radical departure from the terms of the trade agreement certainly evinces a legislative intention to depart in some particular from the purposes set out in that agreement and in the act as first introduced in Congress. It is well therefore to consider the terms of the agreement, together with the changes therefrom which appear in the present act.

If the reciprocity act had been adopted in its original form, and if Canada had enacted reciprocal legislation in the terms proposed by

the diplomatic agreement, four provisions would have obtained relating to paper and wood pulp: First, a provision for the free entry of such paper and wood pulp from Canada into this country; second, a condition making the former provision applicable only in case no export charge, prohibition, or restriction of exportation shall have been imposed upon such paper or wood pulp, or upon the wood used in the manufacture of such paper and wood pulp; third, a condition that the preceding provisions should not become operative until Canada reciprocally should give free entry to such paper and wood pulp when imported from the United States; and fourth, a provision that such paper and wood pulp should be admitted free from the United States into Canada only when such paper and wood pulp should be admitted free into the United States *from all parts of Canada.*

A comparison of these four provisions discloses the fact that if adopted as thus proposed the effect would have been to deny free entry into this country of any such Canadian paper or wood pulp until all such paper and wood pulp from all parts of Canada should be entitled to like free entry. For our provisions relating to paper and wood pulp were all to be inoperative until Canada should admit paper and wood pulp from the United States to free entry, and Canada declined to do this until such Canadian paper and wood pulp should be admitted free into the United States *from all parts of Canada.* Therefore, if Congress intended to grant free entry to certain paper and wood pulp from Canada, upon conditions which obtained in some parts of Canada, but not in all parts, it was necessary to make one of two changes in the proposed reciprocity scheme: Either, upon the one hand, Canada must recede from the requirement that such paper and wood pulp must first be admitted free into this country from all parts of Canada, or, upon the other hand, the provisions of the reciprocity act relating to paper and wood pulp must be given operation regardless of any reciprocal legislation by Canada. But if Congress intended the paper and wood pulp provisions to remain inoperative until all such Canadian paper or wood pulp, and also all Canadian pulp wood, should become export-free, then no change at all was required in the terms of the original act, for that result would follow from its original terms when construed together with the proposed Canadian legislation.

It is most significant that Congress thereupon struck out the condition which required reciprocal legislation by Canada in order to make the paper and wood pulp provisions operative, and thus avoided the result which otherwise would have followed. That action was taken for the unmistakable purpose of admitting into this country free of duty certain Canadian paper and wood pulp, without requiring any precedent legislation upon the part of Canada.

In this construction the condition precedent of section 2 simply serves to describe and define the paper and wood pulp which became thereby entitled to free entry into this country under the section. Thus in order to give section 2 immediate operation for the free admission into this country of the paper and wood pulp therein described, Congress abandoned that provision of the preliminary agreement which promised to this country a conditional free entry of our paper and wood pulp into Canada. That provision would not have been abandoned except that such a course was necessary in order to give immediate operation to section 2.

It may be argued that the right to free admission into Canada of our paper and wood pulp would be barren of real advantage to our people, since such articles are produced in Canada at less cost than in the United States; and accordingly that the right in question was abandoned by this action of Congress for that reason alone. Such an explanation might be satisfactory had Congress simply refrained from a contest for the free admission of our paper and wood pulp into Canada, or had Congress declined to concede an extra reciprocal consideration for such a right. But according to appellant's claim Congress actually refused the offer of free admission of our paper and wood pulp into Canada, notwithstanding the fact that no extra concession on our part was demanded as a consideration for that right. For according to appellant's construction section 2 as enacted conforms to the diplomatic agreement in all things except the provision for the free admission of our paper and wood pulp into Canada.

One fact, however, may confidently be stated. Congress did not act inadvertently in striking out of the provisions for paper and wood pulp the requirement for reciprocal legislation by Canada; for amendments were afterwards offered and urged for the purpose of restoring the rejected provision to the act. Confirmation is thereby added to the belief that Congress rejected the requirement for reciprocal free entry of our paper and wood pulp into Canada as a condition precedent to the operation of section 2, because Congress intended to give immediate free entry into this country to such Canadian paper and wood pulp as were described in that section, and did not intend to postpone the operation of the section until after Canada and the Provinces had first taken reciprocal action in the matter.

A consideration of the language of section 2, as adopted, lends support to this view. Taking wood pulp alone as the subject, the section is most susceptible to the following interpretation: Wood pulp, being the product of Canada, when imported therefrom directly into the United States, shall be admitted free of duty on the condition precedent that no export charge or prohibition or restriction of exportation shall have been imposed upon such wood pulp thus imported,

nor upon the pulp wood from which the imported wood pulp was manufactured. This construction makes the words, "such wood pulp," refer to the wood pulp composing the given importation seeking free entry under the section.

Appellant contends that the foregoing construction is made inadmissible by the presence in the condition precedent of the terms, "prohibition * * * of exportation," claiming that if the terms of the condition precedent are applied in each case to the merchandise composing the particular importation, the absurd result will follow that in each case it must be asked whether any prohibition of exportation had been imposed by Canada upon merchandise already obviously exported. It is claimed by appellant that the real result of such a construction is to eliminate the words, "prohibition * * * of exportation," from the condition precedent by thus denying them any real force or effect therein.

This objection, however, is met by the fact that the condition precedent provides in the case of each entry of paper or wood pulp that not only the imported articles themselves but also the pulp wood from which they were manufactured must have been entitled to exportation free of export charge, or prohibition or restriction of exportation, in order that the importation shall be allowed free entry into this country. In this construction the words "prohibition * * * of exportation" are applied to the material from which the actual importation was manufactured, being the component wood pulp if the importation be paper, or pulp wood if the importation be wood pulp. It is thus provided by the condition precedent that free entry into this country shall be had by Canadain paper or wood pulp only when the given paper and wood pulp, and the wood from which they were manufactured, are entitled to exportation from Canada free of any export charge or prohibition or restriction of exportation.

It is contended by appellant that the foregoing construction opens the door to flagrant abuse and evasion of the section in practice. This objection is answered by a reference to the very comprehensive provisions of the section itself, which deny free entry to the enumerated articles if they, or the wood from which they were manufactured, are subject upon exportation to any export duty, export license fee, or other export charge whatsoever, whether in the form of additional charge or license fee or otherwise, or any prohibition or restriction in any way of exportation, whether by law, order, regulation, contractual relation, or otherwise, directly or indirectly.

The terms and language of section 2 are not altogether new in tariff legislation, as will appear by the following copy of paragraph 406 of the tariff revision of 1909. The first proviso of that para-

graph resembles in some particulars the provisions of section 2, although differing therefrom in other particulars.

406. Mechanically ground wood pulp, one-twelfth of one cent per pound, dry weight: *Provided, however*, That mechanically ground wood pulp shall be admitted free of duty from any country, dependency, province, or other subdivision of government (being the product thereof) which does not forbid or restrict in any way the exportation of (whether by law, order, regulation, contractual relation, or otherwise, directly or indirectly) or impose any export duty, export license fee, or other export charge of any kind whatsoever, either directly or indirectly (whether in the form of additional charge or license fee or otherwise) upon printing paper, mechanically ground wood pulp, or wood for use in the manufacture of wood pulp: *Provided further*, That if any country, dependency, province, or other subdivision of government shall impose an export duty or other export charge of any kind whatsoever, either directly or indirectly (whether in the form of additional charge, or license fee, or otherwise) upon printing paper, mechanically ground wood pulp, or wood for use in the manufacture of wood pulp, the amount of such export duty or other export charge shall be added as an additional duty to the duty herein imposed upon mechanically ground wood pulp when imported directly or indirectly from such country, dependency, province, or other subdivision of government. Chemical wood pulp, unbleached, one-sixth of one cent per pound, dry weight; bleached, one-fourth of one cent per pound, dry weight: *Provided*, That if any country, dependency, province, or other subdivision of government shall impose an export duty, or other export charge of any kind whatsoever, either directly or indirectly (whether in the form of additional charge or license fee or otherwise) upon printing paper, chemical wood pulp, or wood for use in the manufacture of wood pulp, the amount of such export duty, or other export charge, shall be added as an additional duty to the duties herein imposed upon chemical wood pulp when imported directly or indirectly from such country, dependency, province, or other subdivision of government.

It is important to note that the foregoing paragraph had been in operation for almost two years preceding the adoption of the reciprocity act. During that period the first proviso to the paragraph had received an official interpretation by the Treasury Department which was promulgated as T. D. 30045. According to that interpretation the terms of the proviso in question were held by the department to refer to the individual importation in each case and not to the entire class of similar articles in Canada. The cognate provisions of the second proviso of the paragraph, which impose a cumulative duty upon importations of mechanical wood pulp equal to the export charge imposed by the country of exportation, were likewise interpreted to apply to the circumstances of each particular importation. Accordingly, if a particular importation of mechanical wood pulp was given free exportation by the country of exportation, and if the pulp wood from which it was manufactured was entitled to like free exportation, the importation was given free entry into this country under the terms of the proviso; and if, on the other hand, the country of exportation had imposed an export charge upon the particular importation, a cumulative charge of equal amount was added to the primary duty provided by the paragraph. This official action of the department was of course well known to Congress at the adoption of the reci-

procity act. It may therefore be assumed that if Congress had intended in that enactment to depart from or forbid the application of the foregoing interpretation, apt words would be found in the section for the accomplishment of that purpose. A bare inspection, however, of the two provisions, namely, the first proviso of paragraph 406 and the condition precedent of section 2, discloses the fact that the language of the latter enactment is much more susceptible to the interpretation in question than is the language of the former one. It is not important in this connection to determine whether or not the interpretation placed by the department upon the proviso was a correct interpretation. The important fact is that such an official interpretation had been promulgated by the department as was well known to Congress, and that nevertheless the present legislation *in pari materia* does not forbid but rather invites a similar interpretation.

On the other hand, if Congress had intended that section 2 should not become operative until certain reciprocal action should first be taken by the Canadian Provinces respecting the exportation into this country of Canadian wood pulp and pulp wood, that intention would probably have been expressed in terms similar to those which serve a similar purpose in the several schedules of section 1 of the reciprocity act. Instead of this, however, such terms were expressly stricken out of the paper and wood pulp provisions as enacted in section 2, and a continuance of the department's interpretation was approved by that action.

Another consideration which weighs against appellant's contention appears from a comparison of the first proviso of paragraph 406, above copied, with the terms of section 2, as construed by appellant. For convenience the following parts of paragraph 406 are again copied.

406. Mechanically ground wood pulp, one-twelfth of one cent per pound, dry weight: *Provided, however*, That mechanically ground wood pulp shall be admitted free of duty from any country, dependency, province, or other subdivision of government (being the product thereof) which does not forbid or restrict in any way the exportation of (whether by law, order, regulation, contractual relation, or otherwise, directly or indirectly) or impose any export duty, export license fee, or other export charge of any kind whatsoever, either directly or indirectly (whether in the form of additional charge or license fee or otherwise) upon printing paper, mechanically ground wood pulp, or wood for use in the manufacture of wood pulp. * * *

By force of the foregoing proviso Congress provides that mechanical wood pulp shall be admitted into this country free of duty from any country or province which does not forbid or restrict the exportation of printing paper, mechanical wood pulp, or wood used in the manufacture of wood pulp. This provision applies to all countries alike and is concededly in force unless modified by the provisions of section 2 of the reciprocity act.

Section 2, however, according to appellant's contention, offers free admission into this country to Canadian mechanical wood pulp, upon

the condition precedent that the Canadian Provinces shall first repeal their existing restrictions upon the exportation to this country of such wood pulp and of pulp wood. But if section 2 offers free entry to Canadian mechanical wood pulp upon the foregoing condition precedent, it must follow that the same section impliedly forbids the free entry of the same article into this country until the condition precedent is complied with. The appellant's construction thus results in an actual discrimination by section 2 against Canada, because of its effect upon the application of the proviso in paragraph 406; for by that construction all other countries may import mechanical wood pulp into this country free of duty upon compliance with certain specified conditions, whereas Canada may import such mechanical wood pulp into this country free of duty only upon compliance with more onerous conditions. The practical result of this would be an exclusion of Canada from the proviso in question, which certainly was not intended by Congress.

It may be argued that Congress intended that the proviso of paragraph 406 should remain in full force and effect until the entire reciprocity scheme should become operative by reciprocal action upon the part of Canada. Such an argument, however, places Congress in the attitude of tendering to Canada by the reciprocity act the free entry into this country of mechanical wood pulp upon condition that Canada should comply with certain requirements, which tender was made as a part consideration and inducement for action by Canada granting free exportation of pulp wood into this country; whereas at the time of offering the consideration and inducement Congress knew that Canada in common with other countries already enjoyed, and would nevertheless continue to enjoy, the right of free entry into this country for mechanical wood pulp upon more favorable terms and conditions than those offered in the tender. This anomalous result impeaches the correctness of the proposed construction.

It is contended by appellant that section 2 was adopted by Congress in order to induce the provincial authorities of Canada to remove the existing restrictions and prohibitions upon the exportation of pulp wood cut from the Crown lands in the Provinces, and that free entry into this country of Canadian paper and wood pulp was offered as a consideration for the removal of those restrictions and prohibitions. It is furthermore contended that it will work an utter miscarriage of the section if it be so construed as to allow free entry into this country of the enumerated paper and wood pulp manufactured in Canada from fee-land wood, which was always entitled to free exportation from Canada, leaving the Crown-land wood still subject to the export restrictions and prohibitions in question. Appellant contends that the legislative purpose can be accomplished only by denying free entry to the enumerated com-

modities, until all restrictions and prohibitions are removed from the exportation of the Crown-land wood throughout all the Provinces.

In opposition to this contention it is claimed by appellee that Congress could not have intended to postpone the operation of section 2 until every Province of Canada had removed all existing restrictions and prohibitions of exportation from all the pulp wood situate thereon. It is argued that such a construction would require that every piece of pulp wood standing in Canada must first be made free of all restrictions and prohibitions of exportation before section 2 would become operative for any purpose whatever, and that Congress could not have intended a requirement so remotely probable of fulfillment and so liable to interruption.

It must be apparent that these considerations are doubtful aids in the solution of the present question. Nevertheless, appellant's claim is made improbable by the fact that it makes the section in question totally inoperative if any Canadian Province imposes any restriction upon the exportation to this country of any one of the enumerated articles, regardless of the action of the other Provinces upon the same subject.

In accordance, therefore, with the foregoing conclusions the court is of the opinion that inasmuch as the present importation consists of chemical wood pulp, the product of Canada, imported therefrom directly into the United States, and inasmuch as the imported wood pulp, and likewise the pulp wood from which it was manufactured, were entitled to exportation from Canada into the United States free of any export charge or prohibition or restriction of exportation, the importation is within the provisions of section 2 and is entitled thereby to admission free of duty.

The decision of the board to that effect is therefore *affirmed*.

MONTGOMERY, Presiding Judge, and SMITH and BARBER, Judges, concur.

### DISSENTING OPINION.

DE VRIES, Judge: I dissent from the views of the majority of the court herein expressed. This appeal concerns the dutiable status of chemical wood pulp imported directly from the Province of Ontario, Canada, in 1912. The importation was rated for dutiable purposes under the provisions of section 2 of the so-called reciprocity act of July 26, 1911, entitled "An act to promote reciprocal trade relations with the Dominion of Canada, and for other purposes," as follows:

SEC. 2. Pulp of wood mechanically ground; pulp of wood, chemical, bleached or unbleached; news print paper, and other paper, and paper board, manufactured from mechanical wood pulp or from chemical wood pulp, or of which such pulp is the component material of chief value, colored in the pulp, or not colored, and valued at not more than four cents per pound, not including printed or decorated wall paper, being the products of Canada, when imported therefrom directly into the United States,

shall be admitted free of duty, *on the condition precedent* that no export duty, export license fee, or other export charge of any kind whatsoever (whether in the form of additional charge or license fee or otherwise), or any prohibition or restriction in any way of the exportation (whether by law, order, regulation, contractual relation, or otherwise, directly or indirectly), shall have been imposed upon such paper, board, or wood pulp, or the wood used in the manufacture of such paper, board, or wood pulp, or the wood pulp used in the manufacture of such paper or board.

As recited in the majority opinion, said section 2 came into the statutes as a part of an act of Congress enacted in response to a certain treaty agreement with Canada. It is, among other things, claimed by appellant, who contests the applicability of this law, that as the Canadian Parliament refused to duly approve the treaty agreement, this section of the enactment with the entire act of Congress thereby became a nullity. If that were true and it were so held, the case would be concluded. The majority of the court, however,. reaches a contrary conclusion, and in my view of the case this point is unnecessary of decision.

The act consists of two sections, and the majority opinion proceeds upon the theory that "the act as adopted contains no words which specifically or·impliedly make the operation of either section dependent upon the operation of the other." Without seeking to controvert or affirm that position, I will proceed upon the assumption that each section thereof becomes operative independent of the other upon performance of the conditions precedent respectively therein prescribed.

The major portion of the majority opinion is devoted to conclusions drawn from the legislative history of the act and the claimed intent of Congress as evidenced thereby. While it is true that the act became a law in all particulars precisely as introduced in the House of Representatives, the "amendments by Congress" spoken of and given great weight by the majority opinion were, in fact, had by the House only in another Congress of different membership and political complexion from the one which enacted the law. It would seem, nevertheless, that such action, constituting a part of the legislative history making up the final form of this legislation, should be relevantly instructive.

The conclusion, deduced from this history by my colleagues, is that the bill as first introduced in the House by Mr. McCall in the Sixty-first Congress (the law enacted having originally been a bill introduced into the Sixty-second Congress by Mr. Underwood) followed and was in accordance with the treaty agreement. And that before passage by the House the bill was amended in particulars indicating, and for the express purpose of accomplishing, the congressional purpose thereby inferred in the majority opinion, to wit, that they referred its application to individual importations rather than to all such from Canada.

I am unable to agree in either conclusion. I am unable to see how the enacted legislation resultant upon these changes is effective of the assigned purpose, and equally unable to conclude that the amendments so made were for any purpose other than to render proposed unenforceable legislation enforceable.

In my opinion, the McCall bill as introduced did not follow the treaty agreement, but, as reported from the Ways and Means Committee to and passed by the House, did, and was identical in all pertinent particulars with the Underwood bill subsequently introduced in the next Congress and which unamended in any particular became this law. Each bill thus in all respects complied with the treaty agreement in so far as legislation upon part of Congress was therein stipulated.

The crucial question in the case is whether section 2 requires, before it shall become operative, that all export taxes, license fees, and prohibitions, as therein enumerated as conditions precedent, shall be removed therefrom *in all parts of Canada;* or, did it immediately become operative, relate to the particular importation, and require the removal of such taxes, fees, and prohibitions as to that alone ?

The enumerative clause descriptive of the subject matter of wood pulp, pulp wood, paper, paper board, etc., being identical in all cases, it may be more conveniently referred to as the "wood-pulp" clause.

Concededly, the agreement stipulates the former requirement; and, if the act conforms with the treaty agreement, argues the majority view is in error, hence it is necessary in order to sustain that position that it be established that said section 2 departs from the treaty agreement. It is my view that the law is precisely within and in no particular departs from the agreement. As this is a question of great moment and international concern, was ably debated on both sides in Congress, and made the subject of serious controversy at the hearing and in the briefs in this case, I feel justified in giving it the warranted and necessary space for full consideration. That we may proceed with exactitude, the pertinent provisions of the agreement are quoted as follows:

3. It is agreed that the desired tariff changes shall not take the formal shape of a treaty, but that the Governments of the two countries will use their utmost efforts to bring·about such changes by concurrent legislation at Washington and Ottawa.

5. As respects a considerable list of articles produced in both countries, we have been able to agree that they shall be reciprocally free. A list of the articles to be admitted free of duty into the United States when imported from Canada, and into Canada when imported from the United States, is set forth in Schedule A.

10. With respect to the discussions that have taken place concerning the duties upon the several grades of pulp, printing paper, etc.—mechanically ground wood pulp, chemical wood pulp, bleached and unbleached, news printing paper and other printing paper and board made from wood pulp, of the value not exceeding four cents per pound at the place of shipment—we note that you desire to provide that such articles from Canada shall be made free of duty in the United States only

upon certain conditions respecting the shipment of pulp wood from Canada. It is necessary that we should point out that this is a matter in which we are not in a position to make any agreement. The restrictions at present existing in Canada are of a provincial character. They have been adopted by several of the Provinces with regard to what are believed to be provincial interests. We have neither the right nor the desire to interfere with the provincial authorities in the free exercise of their constitutional powers in the administration of their public lands. The provisions you are proposing to make respecting the conditions upon which these classes of pulp and paper may be imported into the United States free of duty must necessarily be for the present inoperative. Whether the provincial Governments will desire to in any way modify their regulations with a view to securing the free admission of pulp and paper from their Provinces into the market of the United States, must be a question for the provincial authorities to decide. In the meantime, the present duties on pulp and paper imported from the United States into Canada will remain. Whenever pulp and paper of the classes already mentioned are admitted into the United States free of duty from all parts of Canada, then similar articles, when imported from the United States, shall be admitted into Canada free of duty.

13. It is understood that upon a day and hour to be agreed upon between the two Governments the President of the United States will communicate to Congress the conclusions now reached and recommend the adoption of such legislation as may be necessary on the part of the United States to give effect to the proposed arrangement.

14. It is understood that simultaneously with the sending of such communication to the United States Congress by the President, the Canadian Government will communicate to the Parliament of Canada the conclusions now reached and will thereupon take the necessary steps to procure such legislation as is required to give effect to the proposed arrangement.

15. Such legislation on the part of the United States may contain a provision that it shall not come into operation until the United States Government are assured that corresponding legislation has been or will be passed by the Parliament of Canada; and in like manner the legislation on the part of Canada may contain a provision that it shall not come into operation until the Government of Canada are assured that corresponding legislation has been passed or will be passed by the Congress of the United States.

SCHEDULE A.—Articles the growth, product, or manufacture of the United States to be admitted into Canada free of duty when imported from the United States, and reciprocally articles the growth, product, or manufacture of Canada to be admitted into the United States free of duty when imported from Canada.    *    *    *

Pulp of wood mechanically ground; pulp of wood, chemical, bleached, or unbleached; news print paper, and other paper, and paper board, manufactured from mechanical wood pulp or from chemical wood pulp, or of which such pulp is the component material of chief value, coloured in the pulp, or not coloured, and valued at not more than four cents per pound, not including printed or decorated wall paper.

*Provided,* That such paper and board, valued at four cents per pound or less, and wood pulp, being the products of Canada, when imported therefrom directly into the United States, shall be admitted free of duty, on the condition precedent that no export duty, export license fee, or other export charge of any kind whatsoever (whether in the form of additional charge or license fee or otherwise) or any prohibition or restriction in any way of the exportation (whether by law, order, regulation, contractual relation, or otherwise, directly or indirectly) shall have been imposed upon such paper, board, or wood pulp, or the wood used in the manufacture of such paper or board.

*Provided also,* That such wood pulp, paper or board, being the products of the United States, shall only be admitted free of duty into Canada from the United States when such wood pulp, paper, or board, being the products of Canada, are admitted from all parts of Canada free of duty into the United States.

Schedules B, C, and D relate to an enumeration of articles to be rated the same for duty when imported into each country and to articles rated at different and less rates of duty than that provided by the general law of the respective countries.

What was the treaty agreement as to pulp wood, wood pulp, and paper?

Herein originated the source of much contention and confusion. To ascertain the agreement as to this subject matter we must read together section 5, the caption of Schedule A, and the latter portion thereof, quoted. It would seem that after all the difficulties were more typographical as to arrangement in the schedules than actual. Evidently the insertion of the provision as to wood pulp, paper, etc., in this schedule was a palpable error which the Ways and Means Committee later discovered and corrected, and this was the sole and only "intent" or "reason" or "purpose" of Congress in making the change. The documents demonstrate the conclusion.

Section 5 of the agreement characterizes Schedule A that "as respects a considerable list of articles produced in both countries, we have been able to agree *that they shall be reciprocally free.*" The caption or title of the schedule follows in precise accord with section 5, stating, "Schedule A.—Articles * * * *to be admitted into Canada free of duty* * * * and reciprocally * * * to be *admitted into the United States free of duty* * * *.*" Then follows the enumeration of such articles, included within which is the provision for pulp of wood, print paper, and paper board, *with the provisos,* all as quoted, *supra.* But while section 5 and the caption of Schedule A denominated its contents as articles to be admitted into each country *reciprocally free of duty,* as to this subject matter there was attached another express condition, to wit, that before such could be admitted free of duty into this country all export taxes, prohibitions, and fees should be removed therefrom by Canada. Here then in Schedule A was a provision absolutely contradictory of the previously expressed purposes of that schedule.

The agreement and caption said that this subject matter should be admitted into each country reciprocally free. The first proviso said that the subject matter could not be admitted into this country until all export taxes, etc., levied by Canada were removed. Which was to control? Manifestly this schedule was dealing with an entirety, and this provision defeated its very purpose by denying reciprocal free entry to the other enumerated articles when such was established by reciprocal laws by possibly preventing and prolonging such until these export taxes, etc., as to wood pulp shall have been removed. Since the agreement (sec. 5) stated that Schedule A was of things "we have been able to agree * * * *shall be reciprocally free,*" and the caption of the schedule extended it to the same only, manifestly

the inclusion therein of a subject matter not *reciprocally free* but only so on compliance with *other expressed* "conditions precedent" was an error. This pulp-wood provision was evidently drawn in compliance with or at least by reason of section 10 of the agreement, and, therefore, and for the other reasons stated, it obviously was not within the clear and unquestionable terms of the agreement that it should have been inserted in Schedule A thereof either as a part of the agreement or as a model form for legislative purposes. The agreement was otherwise, for whatever section 10 effected it was not intended, and that section so states, that that subject matter should interfere with or suspend the effect of the operation of the agreement as to other matters fully agreed to be *reciprocally exchanged*, of which the remaining portions of Schedule A were a part.

The above agreement having been duly communicated to the Congress by the President January 26, 1911, with commendations that the same be enacted into law, the aforesaid McCall bill was introduced into the House and referred to the Committee on Ways and Means.

It is the expressed view of the majority that this bill conformed with the treaty agreement. With this I am unable to agree.

That bill was divided with reference to the articles rated at a less than existing rate of duty, reciprocally for others such, and articles made reciprocally free of duty.

In the list of articles entitled to free entry from Canada into the United States was inserted the identical wood-pulp provision found in Schedule A of the agreement aforesaid, omitting the second proviso. In the list of articles entitled to free entry into Canada from this country was the precise subject matter of that provision omitting all provisos. The bill provided when the President of the United States shall have satisfactory evidence and shall make proclamation that the latter list "are admitted into the Dominion of Canada free of duty" the former list, included within which was said wood-pulp provision, "shall be exempt from duty." Here, again, it was in effect provided that the articles to be reciprocally free were not to be so admitted when so legislated by both countries and proclaimed by the President, as provided in the agreement, but upon this and the additional condition that all export taxes, etc., should have been removed from wood pulp, etc. Moreover, the agreement further shows that there was no unconditional reciprocal arrangement yet possible upon that subject, such as here provided, or otherwise.

And, in passing, it may be remarked that if the contention is upheld that the second proviso to the wood-pulp clause other than construed section 2, added anything to its force and effect, its presence in Schedule A and its absence in the McCall bill add another reason why they did not conform.

Obviously all these matters became apparent to the Ways and Means Committee and were rectified by the amendments made, which

subsequently were approved by the House, and as amended the bill passed the House but failed of passage in the Senate.

If it has been shown that the McCall bill as introduced did not conform with the agreement, did it do so on passage?

After all, the "amendments" by the committee were not of the substance of the McCall bill but solely as to typographical arrangement. The said retaliatory provision as to wood pulp, which had been inserted in the reciprocal free list provision thereby entailing the inconsistencies noted, was taken out and inserted in a separate section. The result was that all those reciprocal matters upon which the pourparlers had agreed stood together to become effective exactly as the agreement provided, and wood pulp upon which they could not agree should be immediately reciprocally free, was made the subject of section 2, wherein it in no wise interfered with or defeated the legislation as to the reciprocal matters. In substance the amendments left the bill exactly as introduced but so typographically arranged that it conformed with rather than defeated the purpose of the agreement. It left the operation of the free reciprocal provision of the bill dependent upon the one condition agreed upon, reciprocal legislation for free entry, and not upon the two conditions, that, and also the removal of all export taxes, etc.

In this connection it is well to note that the McCall bill, as did all other bills, omitted from this legislation the second proviso to said retaliatory or wood pulp provision found in Schedule A of the agreement, as follows:

*Provided also,* That such wood pulp, paper or board, being the products of the United States, shall only be admitted free of duty into Canada from the United States when such wood pulp, paper or board, being the products of Canada, are admitted from all parts of Canada free of duty into the United States.

Did the omission of this provision in the law depart from the agreement?

I think not. If so, as stated, the McCall bill for this additional reason departed from the agreement. When the retaliatory provision went out of the reciprocal free provision for the reasons stated, that proviso of necessity, went with it or must be omitted altogether, else there remained therein and in harmony therewith a provision for reciprocal free entry of wood pulp, etc. By remaining, and the operation of the two sections of the law being assumed independent, it would have still resulted in two different provisions, one in each section of the law, dependent on two different conditions for the free entry of wood pulp, etc., from Canada into the United States.

The acceptance of the reciprocal and not the retaliatory provision would have accomplished the desires of Canada as to free pulp wood into this country without removing her export taxes, prohibitions, etc., which was manifestly the one and particular thing this country was seeking to avoid. The whole history of the matter shows, the

economic conditions argue, and the agreement itself imports, that this country was more anxious to secure the removal of Canada's export taxes and restrictions than reciprocally free wood pulp; and in this Congress acted with a wisdom born of experience. A reciprocal provision for free entry of wood pulp in the presence of the present and possible future Canadian license fees and prohibitions would be nugatory. Congress had experienced that when it laid a duty on a certain article supplied us chiefly by a certain other nation, that nation removed her export tax on that article and we collected the revenues; but that when we made that article free that other nation levied her export tax on the article, with the result that the article remained the same price in this country. We under the former status collected the revenue; said other nation under the latter enjoyed the same. So, the empirical wisdom of Congress taught that reciprocally free wood pulp alone with Canada meant no reduction in the price of such but a sufferance of our revenues and an increase of Canada's. The cheaper cost of production and comparatively insignificant market for such goods in Canada, the great market therefor being in this country, made the most desirable and only effectively advantageous legislation for us—that which would at once give free entry of wood pulp from Canada into the United States, made cheaper yet to our mills by removal of all Canadian export taxes, prohibitions, and restrictions.

But returning to the constructive phases of the case. Was the failure to include the second proviso to the wood-pulp provisions in the act of Congress a failure to comply with the treaty agreement? The agreement speaks of that subject only in section 10, wherein free wood pulp into this country and reciprocal free wood pulp are conditioned upon the removal of all restrictions by Canada, or upon performance with the first proviso to that provision.

An attentive study of that provision must disclose to everyone that *there is no agreement* therein *upon part of the United States to legislate on the subject of wood pulp, print paper, etc.* After reciting regrets and reasons why the pourparlers were not able to immediately agree or contract with reference to immediate unconditional reciprocity upon this subject, it is rested with the stipulations:

In the meantime, the present duties on pulp and paper imported *from the United States into Canada* will remain. Whenever pulp and paper of the classes already mentioned are admitted into the United States *free of duty from all parts of Canada*, then *similar articles* when imported from the United States, *shall be admitted into Canada free of duty*

This was a conditional agreement to become effective in the future. What does it stipulate? Clearly, *cooperative legislation* upon behalf *of the two* high contracting parties. *It calls upon Canada* to legislate that when this specified class of subjects *shall be admitted free from*

*all parts of Canada* into the United States, then *her tariff laws* shall be so amended as to admit the same subjects imported from the United States free of duty into Canada. This was not the subject of legislation for Congress. We can not amend Canada's laws. It was a stipulation binding not upon Congress but upon the Parliament of Canada.

Accordingly the legislative history of the subject advises us that *this exact provision was made a part of the "Tariff resolutions"* communicated to and introduced into the Parliament of Canada, "January 26, 1911," for the purpose of complying with and enacting into law this agreement upon part of Canada. (Congressional Record, 62d Cong., 1st sess., p. 2376.) Canada understood that this stipulation was upon that Government, not upon this or our Congress, and proceeded accordingly to compliance. Canada, however, could not enact that pulp wood, etc., would be given free entry into this country on removal by her of export taxes, etc., nor for reasons stated in the agreement that such should be removed from all parts of Canada. That part of the stipulation to legislate ran to and was obligatory upon Congress and this country. Our Congress alone could provide a law repealing or amending our existing tariff laws, providing that upon certain conditions precedent those laws would be *pro tanto* amended or suspended and these goods admitted free into the United States. The only part of the agreement obligatory upon our Congress was to provide that when these restrictions were removed *from all parts of Canada*, as provided in the agreement, *then* we would give free entry to wood pulp imported *from all parts of Canada*. This is exactly and fully what the agreement required *upon part of this country*. Section 13 expressly provided that the President shall recommend such legislation "as may be necessary *on part of the United States* to give effect to the proposed agreement." This is precisely what section 2 enacts. And if section 2 fails to give this country all conceded in this agreement by confining its application to the particular importations instead of *to all parts of Canada*, Congress has accordingly been remiss in its enactment.

It may be here properly said that in view of this cooperative legislation necessary of enactment in part by each country to give full effect to the terms of the agreement, section 10, I am led to withhold an unnecessary assent, in my view of the case, from the proposition of the majority of the court, that section 2 of this act has *full or any effect* as agreed without the corresponding legislation by the Parliament of Canada.

This brings us to a consideration of the office and import of the second proviso to the wood-pulp provision in Schedule A of the treaty agreement. I have endeavored to show that, standing in the relation that it did in Schedule A of the agreement, it resulted in a

defeat of the purposes of the agreement, and that its substituted provisions, as arranged in the McCall bill, were subject to the same objection.

Now, what was the force and effect of this proviso when read solely in connection with the purview and first proviso of the wood-pulp provision as that provision appears in the agreement and all through this legislation, for their language is identical?

Read along with the two provisos, the meaning is plain. We said to Canada, we will give you free pulp, print paper, etc., for two separate and distinct things: First, you must remove your export taxes and restrictions. Second, thereupon we will give you free entry into the United States, and you will give us reciprocal free entry into Canada for these things. Canada replies, Agreed. It is written as understood in this provision. First, the subject matter is defined. Then are added by the first proviso what we first demand by way of the removal of restrictions, etc. Then is written what shall follow, when that which precedes is complied with, by describing the status upon the performance of that which precedes. That status is as described in the second proviso, that wood pulp shall be admitted free into Canada when such is admitted free into the United States "*from all parts of Canada.*" We therefore have in the second proviso a construction by the pourparlers of section 2 as applying to all parts of Canada. The second proviso was, however, an entirely separable, distinct, and additional condition to the operation of the wood-pulp provision including the first proviso, and, aside from bearing the stated interpretation, disappeared, as stated, in the course of legislation by Congress. As a separate and additional condition, without any attempted constructive force of what preceded, it appeared as the Root amendment in the Senate, as follows:

And when the President of the United States shall have satisfactory evidence and shall make proclamation that such wood pulp, paper and board, being the products of the United States, are admitted into Canada free of duty.

It did appear, however, as the sole proviso to the provision for free entry into Canada of the exact description of wood pulp, etc., in the corresponding resolution in the Canadian Parliament, as follows:

*Provided,* That such wood pulp, paper or board, being the products of the United States, shall *only* be admitted free of duty into Canada from the United States when such wood pulp, paper or board, being the products of Canada, are admitted *from all parts of Canada* free of duty into the United States.

Bearing in mind that this was the corresponding legislation to section 2 of this act as pending in Congress, drafted after and in accordance with this treaty agreement, it shows an interpretation of the provisions of section 2 as requiring in performance of the conditions precedent therein that such export taxes and restrictions

shall be removed *from all parts of Canada,* whereupon and "only" thereupon free entry of these products into Canada would follow.

That was the interpretation by Canada of the agreement and the provisions of section 2 therein as here in question.

It is said in the majority opinion, "But according to appellants' claim Congress actually refused the offer of free admission of our paper and wood pulp into Canada, notwithstanding the fact that no extra .concession on our part was demanded as a consideration for that right." Admitting the force of the argument for the moment, does the construction placed by the majority opinion upon the act relieve Congress from that charge? It certainly does not so interpret the act as to secure thereby this right.

On the merits, in the light of this history, the objection seems untenable. As attempted to be shown, there was no obligation *upon Congress* by this agreement *to so legislate.* Under the agreement of our sister nation that was Canada's duty. Her agreement, sections 3 and 14, stipulated her every effort in this behalf; and the records of her Parliament at the time this very amendment was being considered in our Senate and at all times this measure was pending in Congress showed that agreement being faithfully kept by the Canadian administration. And, further, the Congressional Records show that this matter was brought to the attention of our Senate as an argument why the Root amendment was unnecessary and no doubt contributed to its defeat as unnecessary. (Congressional Record, 62d Cong., 1st sess., p. 2377.) To say, therefore, that Congress abandoned the right to such privilege seems unwarranted.

And here arises the query, it being shown that the agreement stipulated this reciprocal legislation by Canada and not Congress, and that it was rejected by our Congress after this was pointed out, and it being stipulated in the agreement as one of the conditions to section 2 becoming effective, that law not as yet having been enacted, is section 2 an operative statute before such legislation is had?

And again, were the Canadian resolution now a law, would there be any question that the conditions precedent in section 2 would have to be complied with in all parts of Canada before the right to free entry of such goods from this country into Canada would accrue?

Congress may have deemed the advantage of free pulp into Canada not commensurate with an early removal of the restrictions named and an immediate supply of free wood pulp, and hence warrantably waived such, but the history of the congressional proceedings indicated otherwise as stated. That our pourparlers and Congress clung tenaciously to this retaliatory provision in all the proceedings, exercising every endeavor that its operation should not be interfered with by others, shows it their constant and supreme demand.

Nor did the striking out of the Root amendment as to the section becoming operative upon presidential proclamation depart from the agreement. The agreement, section 15, *supra*, left the method of determination of compliance with its terms permissive with each high contracting party. It stated: "Such legislation on part of the United States *may* contain" such a provision.

That section 2 differs from section 1 of the act in this particular is no doubt due to the difference in their political character and legislative ancestry. Section 1, after the separation of section 2 therefrom, became purely reciprocal legislation. Section 2, after such transposal, became in the nature of retaliatory legislation. The former follows the usual form of all reciprocity treaties and statutes for all time; the latter is patently framed after paragraphs 406 and 409 of the tariff act of 1909, and is similar to paragraph 626 of the tariff act of 1897, and numerous and all similar provisions of law.

Finally, it may be said that *the first proviso to section 2, the only language the construction of which is here in question*, being in identical language as in Schedule A of the agreement, and as stipulated it should provide in section 10 thereof, in all particulars; and the only change therefrom in the law being the elimination of the second proviso, which was in nowise whatsoever related to the first proviso save to declare a construction thereof, but related to the purview of the subject matter, that section 2 is in exact accord with the agreement. And it is equally true, I think, that every provision of this act comports and is in exact accord with the agreement in every particular of required legislation upon behalf of our Congress; and, therefore, the act must be read as the agreement provides.

A conspectus of this controlling rule of law upon such facts was declared by the Supreme Court of the United States in Chew Heong v. United States:

For, since the purpose avowed in the act was to faithfully execute the treaty, any interpretation of its provisions would be rejected which imputed to Congress an intention to disregard the plighted faith of the Government, and, consequently, *the court ought, if possible, to adopt that construction which recognized and saved rights secured by the treaty.* (Chew Heong v. United States, 112 U. S., 536–549.)

There is comfort in this view in that the then President, after months of consideration and study of the subject, expressed to Congress in solemn performance of his high duty the same opinion. In his message to the special session of Congress, convened to pass this law and which did pass it in the exact words spoken of by Mr. Taft, he said:

The House of Representatives of the Sixty-first Congress after the full text of the arrangement with all the details in regard to the different provisions had been before it, as they were before the American people, passed a bill *confirming the agreement as negotiated and as transmitted to Congress.*

The argument by appellants that the use of the words "prohibition * * * of exportation" in the statute makes for their contention seems not fully answered in the majority opinion. It is stated:

Appellant contends that the foregoing construction is made inadmissible by the presence in the condition precedent of the terms, "prohibition * * * of exportation," claiming that if the terms of the condition precedent are applied in each case to the merchandise composing the particular importation, the absurd result will follow that in each case it must be asked whether any prohibition of exportation had been imposed by Canada upon merchandise already obviously exported. It is claimed by appellant that the real result of such a construction is to eliminate the words, "prohibition * * * of exportation," from the condition precedent by thus denying them any real force or effect therein.

This objection, however, is met by the fact that the condition precedent provides in the case of each entry of paper or wood pulp that not only the imported articles themselves but also the pulp wood from which they are manufactured must have been entitled to exportation free of export charge, or prohibition or restriction of exportation, in order that the importation shall be allowed free entry into this country. In this construction the words, "prohibition * * * of exportation," are applied to the material from which the actual importation was manufactured, being the component wood pulp if the importation be paper, or pulp wood if the importation be wood pulp. It is thus provided by the condition precedent that free entry into this country shall be had by Canadian paper or wood pulp only when the given paper and wood pulp, and the wood from which they were manufactured, are entitled to exportation from Canada free of any export charge or prohibition or restriction of exportations.

While this construction gives these words some effect in the instance cited, it does not seem applicable in every instance of importations of all classes of the goods named in the act. Suppose there were a prohibition or restriction levied by Canada or one of its Provinces against the exportation of print paper and on no other of these subjects and an importation of wood pulp into the United States were made. Under the application of that part of the act, there being no prohibition against the particular exportation or that from which the wood pulp was made, the importation would be entitled to free entry notwithstanding the prohibition against print paper. The result would be that the paper mills of this country would be doubly benefited and consumers of paper injured. This construction would in such a case deny application of this part of the act.

As bearing upon and supporting the conclusion reached by my colleagues, the rule of departmental construction is invoked. The statute construed wherein the rule is invoked was paragraphs 406 and 409 of the act of August 5, 1909. This act was passed July 26, 1911. The only constructions of the said paragraphs of the act of 1909 were by the Treasury Department August 26, 1909, and October 16, 1909. This protest was filed May 25, 1912. The right to file such a protest was not finally declared by this court until March 12, 1912.

The rule of departmental construction has been so often declared by the Supreme Court to require a "long continued" and "uniform" interpretation " acquiesed in" that it must be regarded as settled. In Robertson v. Downing (127 U. S., 607, 613) the rule is stated in a case where it had continued from 1874 to 1882 as follows:

The regulation of a department of the Government *is not of course to control the construction of an act of Congress when its meaning is plain.* But when there has been *a long acquiescence* in a regulation, and by it rights of parties for many years have been determined and adjusted, it is not to be disregarded without the most cogent and persuasive reasons. United States v. Hill (120 U. S., 169, 182); United States v. Philbrick (120 U. S., 52, 59); Brown v. United States (113 U. S., 568, 571).

In United States v. Recorder (27 Fed. Cas., p. 718, No. 16129, 1 Blath., 218) the Circuit Court for the Southern District of New York said of a departmental construction continuing for a period o 12 years that it was of "comparatively short duration." That such must be *long continued and uniform,* see also United States v. Falk (204 U. S., 143). In Komada v. United States (215 U. S., 392, 396) the practice had continued for a period of eight years and the statute was reenacted *in hæc verba.* It is of the very essence of the rule of legislative adoption that *the language of the statute should be essentially the same.*

That the language of those paragraphs is not the same as section 2 seems assumed. The majority opinion states: "The language of the latter enactment" (sec. 2) "is much more susceptible to the interpretation in question than is the language in the former" (act of 1909). The language of the latter I think plain, and, as tacitly admitted in the majority opinion, the invoked construction made by the Treasury Department was clearly beyond the law. It should not here, then, be a precedent. Moreover, the construction by the Treasury Department was not "uniform." Upon the precise point in question and affecting language similar to that in the reciprocity act whether or not retaliatory provisions for prohibition or restriction of importations by a Province related to the particular importation or applied to all importations and the whole of each from every part of the particular Province or subdivision of government, two Acting Secretaries of the Treasury promulgated diametrically opposed views. In T. D. 29968, promulgated August 26, 1909, the instruction of James B. Reynolds, Acting Secretary of the Treasury, was that the law required in the case of the Province of Ontario, which prohibited the exportation of mechanically ground wood pulp made from Crown lands, that *all* mechanically ground wood pulp imported from that Province should under the law of 1909 be assessed with the additional rate of duty prescribed by the act. In T. D. 30045, promulgated October 16, 1909, Acting Secretary Charles D. Norton promulgated a directly contradictory opinion as to this provision of the law and its requirements. That did not constitute a *uniform* interpretation.

The invoked construction was continued unchallenged just one year, seven months, and nine days. It was "acquiesced in" just two months and nine days after the right to so protest was finally established. The construction relied upon was by the Treasury Department, one of the parties to this controversy.

It would seem that any presumed legislative purpose to adopt the construction of previous acts is fully rebutted by an examination of the congressional proceedings. While a construction was referred to as a possible one, Senators and Representatives in the discussion, gave little or no attention to such as the controlling construction, but debated the effect of the act as its language imported and rested their individual opinions and arguments and no doubt their votes thereupon solely.

It would seem that this record presents a case far short of the applicability of the well-settled rule of departmental interpretation as defined by the Supreme Court.

The emphasis of the majority opinion calculated to stamp as unreasonable the claim of appellants that, every restriction and prohibition and all export taxes must be removed from every stick of pulp timber in Canada before section 2 becomes operative, finds its complete answer in the agreement, wherein that was unquestionably and concededly the engagement.

In my opinion, waiving the question of its operation before the legislation by Canada stated is had, section 2 of the act entitled "An act to promote reciprocal trade relations with the Dominion of Canada, and for other purposes," is, if at all operative before said legislation, a statute upon conditions.

Until Canada shall accept the terms of this act by legislation or other due acceptance of or compliance with the conditions of the act, it must, until repealed, remain an existing though possibly not operative statute.

The act, entitled as stated, consists of three parts.

The first, when operative, amends the existing law reducing the rates of duty on specified articles "the products * * * of the Dominion of Canada" on the condition precedent to its being operative that the Dominion of Canada shall put into effect certain specified rates of duty upon importations of certain products of this country.

The second, when operative, amends the existing law and gives free entry to certain specified articles "the products * * * of the Dominion of Canada" upon condition precedent to its being operative that the Dominion of Canada shall put into effect free entry for importation of certain specified articles the "products of the United States."

The third, section 2, *supra*, when operative, amends the existing law and gives free entry to certain specified articles "the products of

Canada" upon condition precedent to its being operative that all certain export taxes, license fees, and prohibitions be removed.

The operation of the first and second portions of the act is determined by and "when the President of the United States shall have satisfactory evidence and shall make proclamation" that the Dominion of Canada has duly complied with the stated conditions. The third, section 2, for pulp wood, provides, likewise, that it shall become operative and such "shall be admitted free of duty, *on the condition precedent*" that all export duties, etc., shall have been removed, thereby becoming operative upon the *fact* of such compliance.

While the ascertainment of the performance by Canada of the conditions precedent, whereupon the first two portions of the act shall become operative, is fixed in the President to be announced by proclamation, the ascertainment and determination of the fact of compliance with the conditions precedent prescribed by section 2 is left, when questioned, to the duly constituted tribunals wherein has been previously vested by Congress such determinative power. The legal import of these provisions are identical. In the one case the power of determining and declaring the time when the act is to take effect is vested in the President; in the other the statute becomes operative and continues so during the fact of compliance with the conditions precedent, which fact, when questioned, is under the organic law creating this court here finally decided. Each provision as much as the other, coordinate parts of the same act and unrepealed portions of the same statute, are dormant, but existing legislation, which, when duly accepted by due compliance with the prescribed conditions precedent, will become, unless repealed or modified, the law of the land so far as they speak.

In the due course of commerce and as by law provided this court is now asked to declare that the conditions precedent prescribed by section 2 as to chemical wood pulp imported from the province of Ontario, Canada, have been complied with, and that the right of free entry *under said act* has accrued.

Appellees maintain that whenever all export charges, license fees, prohibitions, etc., named in the section are removed from *the particular importation* and the material from which it is made, the conditions precedent are satisfied.

Appellants contend among other things that the right of free entry does not accrue until all such are removed from the named products in all parts of Canada.

In my view, as stated, it is of equal importance to determine what statute applies in event of the determination that the conditions precedent, whatever they may be, named in section 2, were, at the time of importation, not complied with.

Fundamental to that inquiry is the fact that a statute upon a condition precedent, whatever its amendatory force on existing law when that condition is fulfilled, until such occurs, has no effect whatever upon the laws it may subsequently amend, modify, repeal, or suspend. It follows that until the conditions precedent named in section 2 are duly complied with and at all times when they are not being complied with, the provisions of paragraphs 406 and 409 of the act of 1909 are the law of the land.

That the application of the provisions of a statute may be suspended not alone by the provisions of the act itself but by those of another statute is well settled. Brown *v.* Barry (3 Dallas (3 U. S.), 365); Levey *v.* Stockslager (129 U. S., 470). So Congress may rest the vitality and force of an act upon a contingency that may not be accepted. Beaty *v.* Knowler (4 Peters (29 U. S.), 152).

The efficiency of an act as a declaration of legislative will must, of course, come from Congress, but the ascertainment of the contingency upon which the act shall take effect may be left to such agencies as it may designate. (Miller *v.* Mayor of New York, 109 U. S., 385–394.)

Since the decision of the United States Supreme Court in the great case of Field *v.* Clark it has not been questioned that Congress can enact legislation to become effective or suspended or repealed upon certain contingencies either named in the act itself or other acts. That case reviews *in extenso* the authorities and cites and quotes many acts of Congress as such examples, including many like this act and section 2 thereof, and states generally:

There are many things upon which wise and useful legislation must depend which can not be known to the lawmaking power, and must therefore be a subject of inquiry and determination outside of the halls of legislation. Field *v.* Clark (143 U. S., 649); United States *v.* American Sugar Refining Co. (202 U. S., 563).

Be the conditions what they may in this act, it is by Congress expressly provided that it shall take effect only "upon the condition precedent" that such are complied with. It follows that when not so complied with the act of 1909, paragraphs 406 and 409, express the substitute law *in pari materia,* and that Congress intended the acts complementary one of the other in so far as they cover the same subject matter, each being operative according to the conditions precedent respectively therein expressed.

That the act of 1911 was not intended a repeal of the cognate provisions of the act of 1909 further appears from the express limitations of the former to Canada alone and in other particulars. And any view that they do so repeal must leave this Government in a serious position upon any renewed failure of Canada to comply with the conditions precedent after such repeal.

The concept, therefore, of the legislative purpose is expressed by reading together all the provisions, said paragraphs 406 and 409, and

section 2. A harmonious legislative code follows, each provision becoming in turn effective upon compliance with the expressed conditions as though section 2 were enacted as a proviso to paragraphs 406 and 409, as follows:

By paragraph 406 duty is levied upon mechanically ground wood pulp of one-twelfth of 1 cent per pound, with a proviso that in the absence of any provincial prohibitions or restrictions of export as therein enumerated it shall be admitted from such dependency, province, or other subdivision of government free; and, with the further proviso, that the amount of any export duty or other charge levied upon the products therein enumerated of the dependency, province, or other subdivision of government shall be added to said duty. The paragraph then levied upon chemical wood pulp one-sixth of 1 cent per pound and adds thereto said last proviso.

These provisions expressly extend to the political subdivisions of every country including Canada. Under this paragraph when all parts of Canada remove all such prohibitions, license fees, and export duties mechanically ground wood pulp will be admitted free from all parts of Canada.

By paragraph 409 duty is laid upon certain printing paper, with a proviso that should any country, dependency, province, or other subdivision of government prohibit or restrict exportation of this paper, pulp wood or wood pulp, an additional duty will be laid; and if any export tax or license fee is laid the amount thereof shall be added to this duty. No provision, however, is here had for free print paper.

When, and provided, however, by the operation of 406 and 409 or otherwise, all such restrictions, etc., are removed, sec. 2 becomes operative.

If every part of Canada complied with paragraphs 406 and 409, though we would have pulp wood and wood pulp free of export and license taxes *there would remain a duty upon printing paper.*

We wanted pulp wood and wood pulp imported into the United States free of export and license taxes. Canada wanted free entry into the United States for printing paper. We had pulp wood and wood pulp free from export and license taxes and prohibitions from most of, if not all of, the Provinces of Canada. We had for almost two years experimented with the act of 1909, which dealt in terms with the Provinces, and as construed by the department related only to individual importations, with the result that, as shown by this record, not only were other Provinces adopting these objectionable measures, but by gross subterfuge the act as last construed by the Treasury Department was being avoided. These paragraphs, therefore, were defeating, not subserving, their intended office. We had experience with persuasion *addressed to the Provinces* and a law applied by obviously doubtful construction to individual importations. Accordingly, section 2 was enacted providing that when pulp

wood and wood pulp, etc., were made free of all such taxes and restrictions in all parts of Canada we would give Canada in addition to free pulp wood and wood pulp free entry for her print paper. Congress, therefore, enlisted in its aid to this end as stated in sections 3 and 14 of the agreement not only the Dominion of Canada but all subdivisions of the Government, and until and while these conditions precedent are complied with the act of 1911 is not effective, and the law applicable, in my opinion, is the act of 1909.

The suggestion of the majority opinion that section 2 amends the act of 1909 and makes these articles dutiable *by implication* is contrary to one of the fundamental laws of taxation, that such are *never* levied by implication. Moreover, how can a statute upon condition, effective only when that condition exists or is complied with, amend the law it supersedes without complying with the condition? That would be amendment without effective enactment. *A fortiori;* what *rate* of duty is levied by the *implied* operation of a nondutiable provision?

From the foregoing reasons it would appear that the appellant's claim should be sustained; and that section 2 of the reciprocity act becomes operative only upon and during removal from all parts of Canada all export taxes, licenses, prohibitions, and restrictions enumerated as conditions precedent therein. The following reasons conduce to that conclusion:

1. Undeniably the treaty so provides. The act of Congress made in conformity thereto in nowise departs therefrom and enacts all legislation stipulated upon behalf of Congress.

2. That the history of the statute including the cooperative legislation introduced in the Canadian Parliament conclusively shows this was the understanding and agreement of all parties and that where read together no other intent is inferable.

3. Construed solely by its text the section so provides. Literally, the condition precedent, prescribed thereto, that all export duties, license fees, prohibitions and restrictions shall be removed from "*such* paper, board, or wood pulp," etc., is referable to the antecedent use of those words which use is qualified by the terms "products of Canada." Of course, "such" refers to the antecedent as qualified. Necessarily then it refers to the products of all Canada and not to a part thereof.

4. The substitution of "Canada" alone for "country, dependency, province, or other subdivision of government" qualifying the antecedent thus referred to, as provided in previous acts, for which this is intended a conditional amendment, seems to relate the paragraph to those products of Canada and all parts thereof rather than to subdivisions thereof. *That is the only view that gives some effect to this change in terms.*

5. The Congress had before it the precise agreement in writing of the Canadian Government which formed the basis of the act and Canada's tendered concessions wherein it was stated:

10. * * * Whether the provincial governments will desire to in any way modify their regulations with a view to securing the free admission of pulp and paper from their Provinces into the market of the United States, must be a question for the Provincial authorities to decide. *In the meantime, the present duties on pulp and paper imported from the United States into Canada will remain.* Whenever pulp and paper of the classes already mentioned are admitted into the United States free of duty *from all parts of Canada,* then similar articles, when imported from the United States, shall be admitted into Canada free of duty.

Canada here expressed a willingness to remove these restrictions, or so endeavor to cause to be done, from all parts of Canada, and this legislation was enacted to enforce that agreement. Any other conclusion then than that here stated convicts Congress of accepting less for the concessions made than was agreed by Canada should be given.

The record shows this agreement to have been before Congress, and this reasoning and that in (1), *supra,* is well within the principle adopted by the Supreme Court in the case of Chew Heong *v.* United States (112 U. S., 536–549), wherein the court, speaking of an act of Congress passed with the express purpose of executing a treaty, said:

For, since the purpose avowed in the act was to faithfully execute the treaty, any interpretation of its provisions would be rejected which imputed to Congress an intention to disregard the plighted faith of the Government, and, consequently, *the court ought, if possible, to adopt that construction which recognized and saved rights secured by the treaty.*

6. Section 2 of the act of 1911, takes its place with similar provisions in section 1 of the act. Each provision exchanges the concessions granted to Canada for those granted by Canada. They are all included in an act entitled a reciprocity act. There is just as much reason for saying that the condition precedent of any one of the other provisions would be satisfied upon Canada granting a part of its agreed concessions, or such concessions as to a part of its territory, as to hold her concessions here so satisfied. The whole of our concessions in each case are balanced against the whole of Canada's, and a partial performance by either party will not in my opinion entitle the other to performance. The elementary rules of consideration effect this conclusion.

7. Similar statutes have ever been construed by this Government as statutes upon consideration and of reciprocity, and in no one of such cases has it ever been contended or at least conceded that a partial performance of the consideration moving upon behalf of either party would constitute performance. See American State Papers, For. Rel., V, 152–153; American State Papers, For. Rel., V, 163–165; Richardson, vol. 2, 100–101; American State Papers, For. Rel., V, 673. The above affected the construction of the act of March 3, 1815, affecting tonnage duties between the United States

and Great Britain. See also 21 Op. Atty. Gen., 80–83, construing paragraph 608 of the tariff act of 1894. See also cases cited and quoted in dissenting opinion in American Express Company *et al.* *v.* United States, etc. (4 Ct. Cust. Appls. 146; T. D. 33434), decided of even date herewith.

In view of the foregoing, I am of the opinion that the reciprocity act of 1911 is not operative under the concessions of this record as to existing prohibitions in certain Canadian Provinces and that the imported merchandise is properly dutiable under the provisions of paragraph 406 of the tariff act of August 5, 1909, subject to the conditions therein expressed, and that the decision of the Board of General Appraisers should be reversed.