UNITED STATES *v.* SPANISH RIVER PULP & PAPER MILLS (LTD.)
(No. 1260).[1]

WOOD PULP MANUFACTURED UNDER A SPECIAL AGREEMENT WITH THE PROVINCE OF ONTARIO.

The question for determination is whether the written contracts between the appellee here and the Province of Ontario, Canada, impose any restrictions upon appellee's right to export wood pulp manufactured from pulp wood cut upon Crown lands. *Held*, that the contracts impose certain conditions, some new, some old, to be complied with by the appellee as a continuing consideration for the abrogation of the preexisting contractual prohibition of export of such pulp wood and the enjoyment of the grant of the right to export the same; that these conditions, whether precedent or subsequent, impose burdens upon and result in a restriction of the export of the pulp wood from which the importations were manufactured; and therefore that free entry can not be had under the provisions of section 2 of an act of Congress entitled "An act to promote reciprocal trade relations with the Dominion of Canada, and for other purposes," approved July 26, 1911.

## United States Court of Customs Appeals, April 28, 1914.

APPEAL from Board of United States General Appraisers, G. A. 7490 (T. D. 33707).

[Reversed.]

*William L. Wemple*, Assistant Attorney General, for the United States.
*Comstock & Washburn* for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

The briefs state and the arguments proceed upon the theory that the sole question here is whether ground wood pulp manufactured in the Province of Ontario, Canada, from pulp wood cut on Crown lands in that province and imported after November 25, 1912, is dutiable, as assessed, under paragraph 406 of the tariff act of August 5, 1909, or is entitled to free entry under section 2 of the act of Congress of July 26, 1911, as claimed by the importer.

The Board of General Appraisers heard the case July 1, 1913, and by decision dated August 18, 1913, sustained the importer's claim.

If not entitled to free entry we do not understand that the assessments are challenged.

The relevant facts appear of record as follows: The importers, the Spanish River Pulp & Paper Mills (Ltd.), was on November 25, 1912, and for some time prior thereto had been, the assignee and owner of certain concessions from the Province of Ontario as grantor, set forth in duly executed written contracts in which the minister of Crown lands for that province acted for it and to which contracts the assignors of the importer or their predecessors were the other contracting parties.

These contracts were in effect grants of the privilege to cut pulp wood and other wood on certain tracts of land, one of 75 square miles

---

[1] Reported in T. D. 34426 (26 Treas. Dec., 724).

in the district of Nipissing and the other of at least 50 square miles in the district of Algoma in said province. The time limit of the grants was 21 years from their respective dates or from the dates of certain renewals or modifications thereof, unnecessary to mention. A stipulated price for the timber to be cut thereunder was mentioned in the contracts, and each contained a provision that no wood of any kind should be cut on the lands covered thereby for the purpose of export or for sale for that purpose. The contracts were in force at the time the importations under consideration were made, except as modified by the contract hereinafter set forth.

On the said 25th day of November, 1912, another contract was duly made and executed between the Province of Ontario, represented by its said minister of Crown lands, and the importer here of the following tenor:

Whereas the company is now the owner of a certain concession granted by the Government on the 21st day of September, 1899, to Marshall Jewel Dodge and others and another concession granted by the Government to the Sturgeon Falls Pulp Co., Limited, on the 6th day of October, 1898, subject to the terms and conditions of the respective agreements granting the said concessions and divers agreements from time to time entered into between the Government and the several companies in whom the same were from time to time vested;

And whereas it is provided in the agreements granting the said concessions that the grantees thereof shall not be entitled to cut wood for purposes of export in the wood nor for sale to other persons for export in the wood;

And whereas it is provided in the said agreement of the 21st day of September, 1899, between the Government and the said Marshall Jewel Dodge and others that the company should with all convenient dispatch proceed with the construction of a pulp mill and a paper mill and should thoroughly equip the same so that the expenditure of the company in the construction of the said pulp mill and paper mill and in such other buildings and constructions as should be necessary to the undertaking would be at least the sum of five hundred thousand dollars, and that the company should operate the same so that the annual output of the said mills in pulp and paper should amount to at least twenty thousand tons, and so that at least two hundred and fifty hands on an average should be continuously employed in connection therewith;

And whereas under the conditions governing the concessions granted by the Government by the said agreement of the 6th day of October, 1898, to the Sturgeon Falls Pulp Co., Limited, the company became bound to construct a paper mill at or near Sturgeon Falls and to thoroughly equip the same so that the expenditure in the construction and equipment thereof should be at least one million dollars, and the company is bound to operate the plant so that at least fifteen thousand tons of paper will be manufactured annually, commencing from the 13th day of September, 1912, and so that at least one hundred and fifty hands on an average will be continuously employed in connection therewith;

And whereas the company has now erected at Espanola and Sturgeon Falls large pulp mills and paper mills and plant upon which there has been expended upwards of three million dollars, and the company is now operating the same and is employing in connection therewith a much larger number of hands than prescribed by the said obligations aforesaid;

And whereas the company proposes to extend and enlarge its plant at Espanola aforesaid by the erection and equipment of two additional paper machines and to

expend in connection therewith approximately an additional sum of five hundred thousand dollars;

And whereas the company has applied to the Government to be relieved from the restriction against the export of wood before mentioned and the Government has agreed to grant such relief, subject, nevertheless, to the terms hereinafter contained:

*Now therefore it is agreed:*

1. The company shall, prior to the first day of July, 1913, erect and equip at Espanola aforesaid two additional machines and shall, from and after the said date, continuously operate the same.

2. The company shall, from and after the said first day of July, so operate its pulp and paper mills at Espanola and Sturgeon Falls aforesaid that the annual output of the said mills in pulp and paper will amount to at least fifty thousand tons and so that at least five hundred hands on an average will be continuously employed in connection therewith.

3. The company shall in every year during the season of operations employ at least one thousand hands in the woods cutting wood for the purpose of the operations of the said mills and plant.

4. In consideration of the foregoing the company, its successors and assigns, shall, notwithstanding anything contained in the grants of the said concessions or either of them or in any of the agreements in amendment or extension thereof, be entitled to cut and remove the wood suitable for the manufacture of pulp, authorized to be cut under said agreements, from the lands comprised in the said concessions and each of them (subject to the payment of the dues as provided in the said agreements), not only for the manufacture of pulp and paper in the pulp and paper mills of the company, but also for the purposes of export in the wood or for sale to other persons for export in the wood and all prohibitions and restrictions contained in the grants of the said concessions or in any of the agreements in amendment or extension thereof relating to the export of wood are hereby rescinded and the company, its successors and assigns, shall be and is hereby relieved and discharged therefrom, and the agreements granting the said concessions shall be read as if the said prohibitions and restrictions had not been contained therein.

5. Nothing herein contained shall in any way abridge or curtail any of the covenants, conditions, or obligations contained in the grants of the said concessions or either of them or in any of the agreements in amendment or extension thereof, and all of said covenants, conditions, and obligations shall be and remain in full force, except as hereby amended.

6. In the event of the company, its successors or assigns, failing at any time to perform any of its obligations herein contained or failing to comply with any of the covenants, conditions, or obligations of the company contained in the said agreements granting the said concessions as amended hereby and by the said subsequent agreements then the Government may without any notice revoke the right, license, or permit to cut wood upon the lands comprised in the said concessions and each or either of them or may, by order in council, impose upon the company, its successors or assigns, such regulations or conditions as may more fully and effectually secure to the Government the complete performance of the said covenants, conditions, and obligations and every of them: *Provided, further,* That the lieutenant governor of the Province of Ontario in council may, notwithstanding anything herein contained, from time to time for any cause which may to the Government appear sufficient, by order in council make such regulations or impose such restrictions upon the export in the wood of any pulp wood or other timber cut upon the lands comprised in the said concessions or either of them, and may from time to time rescind, revoke, or vary any such order in council and make other regulations or impose other restrictions in lieu thereof.

This contract was introduced in evidence by the importer and in connection therewith a letter, of which the following is a copy, was also offered by importer and received by the board.

TORONTO, *December 3, 1912.*

T. H. WATSON, ESQ.,
    *Vice President, The Spanish River Pulp & Paper Mills (Ltd.),*
        *Toronto.*

DEAR SIR: In answer to your inquiry, I beg to say that the privilege of exporting pulp wood conferred by the Government upon your company by agreement dated November 25, 1912, became by that agreement immediately effective, and your company has ever since the making of that agreement been and is now at liberty to export pulp wood free from any restriction.

    Yours, truly,

        W. H. HEARST,
        *Minister of Lands, Forests, and Mines.*

At the hearing before the board Mr. Bicknell, a member of the legal profession in Toronto, apparently well versed in the law of Canada as well as that of the Province of Ontario, and who is a director of and counsel for the importer, testified in its behalf. Among other things, he said that neither the Dominion of Canada nor the Province of Ontario imposed any export duty, export license fee, or other export charge of any kind upon wood cut from concessions owned by the importing company; that prior to 1900 neither said Dominion nor said province by statute imposed any export duty, export license fee, or other export charge upon pulp wood; that at the date of importer's original grants there was no law in Canada or said province prohibiting or restricting such export, and that it could only be done by contract.

He further testified that in 1900 a statute was enacted, presumably by the Province of Ontario, which provided, with reference to grants thereafter made, that there should be imposed by the Crown a restriction against export; that this statute was inoperative as to the before-mentioned grants of the importer because subsequently enacted; that the importer desired the prohibition of export contained in the existing contracts of which it was the assignee, removed, because it was thereby hampered in competing with other manufacturing concerns in Canada which were able to export news-print paper and pulp to this country; that the main business of the importer was the manufacture of pulp and paper; that he conducted for the importer with the provincial minister of Crown lands the negotiations which led to the making of the contract of November 25, 1912, above recited; that he pointed out to him that the object of the prohibition of exportation, as contained in the original grants, had been accomplished by the establishment of importer's manufacturing plants in Canada; that its business was manufacturing, and not exporting, raw material; that the removal of the prohibition could not

result in any large exportation of wood because the importer's mills were in Canada and it was more profitable for the importer to manufacture the pulp wood there than to export it; that a good deal was said between the minister and himself upon the subject of whether the desired removal of the prohibition would result in allowing extensive exportation of pulp wood, and that in fact it had resulted in the exportation of only a comparatively small quantity of pulp wood, only one shipment thereof, so far as the witness knew or had heard of.

It also appeared from the testimony of the secretary of the importing company that the annual output of its mills at Espanola and Sturgeon Falls at and prior to November 25, 1912, was 76,000 tons of pulp and paper; that at and prior to said date the number of hands employed thereat on the average was 650 and the number employed in logging operations 1,360; that the two additional paper machines required to be installed on or before July 1, 1913, were actually contracted for about October 1, 1912; that the approximate output of these two machines would be some 18,000 tons per annum; that all the wood cut on the concession lands was driven to the mill on streams; and that wood cut on private lands was also used by the importer in manufacturing pulp and paper.    All the foregoing evidence was uncontradicted.

There was no evidence other than the above from which any inference might be drawn as to what the output of these mills had been since November 25, 1913, or what number of hands had been employed thereat or in the woods by the importer.

Paragraph 406 of the act of 1909, which it is unnecessary to quote in full, and under which the merchandise was assessed, fixes a duty upon wood pulp, but provides, however, that it shall be admitted free of duty from any country or province which does not in any way by law, contract, or otherwise, directly or indirectly, forbid or restrict the exportation of or impose any export duty, fee, or other charge either directly or indirectly upon printing paper, wood pulp, or wood for use in the manufacture of wood pulp, with a provision for countervailing duties under certain conditions therein stated.

Section 2 of the act of Congress entitled "An act to promote reciprocal trade relations with the Dominion of Canada, and for other purposes," approved July 26, 1911, under which the importer claims, provides that—

Pulp of wood mechanically ground; pulp of wood, chemical, bleached, or unbleached; newsprint paper, and other paper, and paper board, manufactured from mechanical wood pulp or from chemical wood pulp, or of which such pulp is the component material of chief value, colored in the pulp, or not colored, and valued at not more than four cents per pound, not including printed or decorated wall paper; being the products of Canada, when imported therefrom directly into the United States, shall be admitted free of duty, on the condition precedent that no export duty, export license fee, or other export charge of any kind whatsoever (whether in

the form of additional charge or license fee or otherwise), or any prohibition or restriction, in any way, of the exportation (whether by law, order, regulation, contractual relation, or otherwise, directly or indirectly), shall have been imposed upon such paper, board, or wood pulp, or the wood used in the manufacture of such paper, board, or wood pulp, or the wood pulp used in the manufacture of such paper or board.

From the evidence above recited it appears that at the time the original grants were made there was no law in force under which an export tax, charge, or fee was imposed upon pulp wood cut on Crown lands in and exported from the Province of Ontario and that the subsequent statute imposing a restriction thereon does not apply to the lands covered by importer's concessions. The importer here, therefore, claims by reason thereof and by force of paragraph numbered 4 in said contract of November 25 that, under the authority of the decision of this court in the case of Cliff Paper Co. v. United States (4 Ct. Cust. Appls., 186; T. D. 33435) where in substance we held that the condition precedent to free entry provided in section 2 related to the individual importation in each case, the merchandise here is entitled to free entry and consequently that there was no error below. In other words, importer claims that upon the execution of said last-named contract it became thereunder *eo instante* entitled to export free from any restriction any pulp wood cut on the concession lands and so entitled to enter free of duty the ground wood pulp in this case.

The importer did not show any performance by it subsequently to November 25, 1912, of the conditions set forth in paragraphs numbered 1, 2, and 3 of said contract and no discussion by either party is had of the question of what, if anything, was necessary to be shown in that respect as a prerequisite of its enjoyment of the right of exportation. We therefore dismiss without considering or discussing any question which might perhaps be raised relating thereto.

In the case of Cliff Paper Co. v. United States, *supra*, Martin, Judge, discussing the circumstances which must be present in order that similar merchandise might under said section 2 be entitled to free entry, said:

It is thus provided by the condition precedent that free entry into this country shall be had by Canadian paper or wood pulp only when the given paper and wood pulp, and the wood from which they were manufactured, are entitled to exportation from Canada free of any export charge or prohibition or restriction of exportation.

It is contended by appellant that the foregoing construction opens the door to flagrant abuse and evasion of the section in practice. This objection is answered by a reference to the very comprehensive provisions of the section itself, which deny free entry to the enumerated articles if they, or the wood from which they were manufactured, are subject upon exportation to any export duty, export license fee, or other export charge whatsoever, whether in the form of additional charge or license fee or otherwise, or any prohibition or restriction in any way of exportation, whether by law, order, regulation, or contractual relation or otherwise, directly or indirectly.

It appeared in that case that the merchandise—chemical wood pulp manufactured in Canada—was free from any export charge or prohibition or restriction of exportation, and that the right to like free exportation was possessed by the pulp wood from which it had been manufactured.

In the case at bar, there being no export tax, charge, or fee imposed upon the pulp wood from which the ground pulp is made, the only question is, whether there is any prohibition or restriction in any way of exportation by contractual relation either directly or indirectly within the meaning of said section 2.

The determination of this question requires an interpretation of the last-mentioned contract, considered as a whole, in the light of the surrounding circumstances under which it was made.

Briefly the circumstances were these: On the 25th day of November, 1912, the importer was the owner, subject to the conditions and provisos contained in the written instruments relating thereto, of certain concessions or grants of the right to cut pulp wood and other wood upon large tracts of Crown lands in the Province of Ontario for a period of substantially 21 years, which has not yet expired. The enjoyment of these concessions by the importer was upon the condition, among other things, that it should establish and equip in Canada pulp and paper mills at an expense of at least $1,500,000 (and which appear in fact to have required an outlay of upward of $3,000,000), and that it should continuously maintain and operate the same to the extent of producing annually at least 35,000 tons of pulp and paper and should employ on an average 400 hands in connection therewith. These concessions prohibited the importer from cutting wood on the lands covered thereby for the purpose of exporting the same in the wood and from selling the same to other persons for export in that condition. On said day it was, and for some time prior thereto had been, producing more than the stipulated amount of product, and was, and had been, employing more than the prescribed number of workmen in connection therewith. It was competing with other Canadian concerns in the exportation of news-print paper and pulp to the United States, and found itself hampered therein because of said prohibition. Thereupon it set about obtaining relief therefrom and entered into negotiations which resulted in the contract of November 25. It had no desire or intention, and so represented to the Crown minister, who negotiated and executed the contract, to export pulp wood to the United States in any considerable amount, but its intent and purpose was to obtain relief from said prohibition in order that it might export to the United States its news-print paper and pulp without paying duty thereon, which it could not do so long as the prohibition was in force. At the

time it was, and ever since has been, contrary to the declared public policy of the Province of Ontario to permit the free and unrestricted exportation of pulp wood cut upon Crown lands under any concession granted after the year 1900.

Without here indulging in any discussion of the objects intended to be accomplished by Congress in enacting said section 2 or reviewing the legislative history relating thereto (reference for that purpose being made to the opinion in the Cliff Paper Co. case), it is apparent that one purpose which animated Congress in its enactment was to promote the unrestricted exportation of pulp wood from Canada to the United States.

The section, however, provides, as pointed out by Martin, Judge, in the language above quoted, that to entitle wood pulp to free entry, not only that there shall be no prohibition of exportation thereof or of the wood from which the same is made, but also that there shall be no *restriction* of such exportation, and the inquiry therefore is, as stated, whether in this contract there is to be found any direct or indirect restriction of exportation of pulp wood cut on the Crown lands in question.

It is manifest that the installing of the additional machines, the employment of the additional help, and the production of the increased output are all new conditions to be performed by the importer in order that it may enjoy the right of export and as a continuing consideration therefor, and that the conditions in the old contracts requiring the continued maintenance of the manufacturing plants in Canada, the production therein of the specified annual product of 35,000 tons, and the employment of the stipulated help are by the new contract also required to be performed by the importer as a condition and continuing consideration for the enjoyment of the same right.

A restriction means a restraint, a limitation, a confinement within certain limits, and one can hardly refrain from querying, if it was intended by the contract of November 25 to remove *all* restrictions upon exportation, why it was not therein stated in simple language, in substance, that the Spanish River Pulp & Paper Mills (Ltd.) was thereby unconditionally relieved and released from the prohibition of export in the earlier contracts provided, notwithstanding anything therein contained to the contrary. This would have left the company entirely free to cut and export pulp wood if it is so desired without compelling it to return, yield, or pay any consideration therefor, and would clearly have accomplished what it is urged *was* accomplished. The importer could then have exported all or any part of the pulp wood cut by it upon Crown lands without incurring any liability to have its rights under the various grants terminated by reason thereof. In other words, its right of export would have been wholly free and unrestricted.

But the parties instead of this elected to contract that certain conditions, some new, some old, and all to be observed and performed by the importer, should be the consideration for the abrogation of the prohibition of export and of the grant of the right thereof. It matters not whether they be considered as conditions precedent or subsequent to the enjoyment of the right, they are burdens undertaken by the importer and to be borne by it so long as the right to export pulp wood continues.

As compared with a concession, the enjoyment of which was dependent only upon the payment of a fair price for stumpage, reasonable skill and prudence in logging operations, and which in no manner restricted the right to export pulp wood, which would be one illustration of a contract permitting its unrestricted export, we think the contract in this case would, in the business world, clearly be regarded as imposing a limitation or restriction upon such export.

One necessary and direct result of the contract is that, to the extent of the pulp wood required to manufacture at least 50,000 tons of pulp and paper annually, there is no right of export whatever, because it can not be exported, but must be manufactured in Canada. By compelling the importer to continuously maintain and operate therein a manufacturing business to the extent and in the manner provided by the contract as a consideration for the granted right of export of pulp wood, material benefits from which maintenance and operation must accrue to the Province of Ontario and its inhabitants, that Province is compelling and receiving substantial tribute of a financial nature for such right. The real purpose and effect of the imposed conditions are to restrict such export, notwithstanding it is in terms declared to be unrestricted, and if any pulp wood is exported pursuant thereto it in fact sustains and bears its proportionate share of such tribute.

It follows, therefore, that whether these importations are a part of the required annual product of 50,000 tons or are part of an excess thereof (the evidence is silent on this question), they are not entitled to free entry as claimed, because the importer has not an unrestricted right to export the pulp wood from which they are manufactured.

The fact that the importer on November 25 was manufacturing more than the then stipulated amount of product or was employing a greater number of workmen than it was then required to employ does not make against this conclusion, because its conduct in that regard was voluntary while the new contract made an increased output and the employment of more workmen obligatory. Neither is it material that it was then more profitable to manufacture the pulp wood in Canada than to export it, because that condition may change, and if it does the importer will be confronted with the alternatives of carrying on one branch of its business at a small or no profit, or even at a

loss, in order to conduct another part, the exportation of pulp wood at a profit, or of submitting to a revocation of its concessions.

The conclusion we reach is really but giving effect to the intent of the parties in making the contract, because on the one hand the importer's object in executing it was to obtain so far as it might the naked right of export without intending to exercise it to any substantial degree but for the purpose of enabling it more successfully to compete with other Canadian manufacturers. On the other hand, the Government's intent was to see to it that but little pulp wood was exported as a consequence of its being entered into, and to make certain this result the Government by the contract armed itself with or rather expressly reserved to itself the right, from time to time and for any cause appearing to it to be sufficient, by order in council to make regulations and impose restrictions not only upon the exportation of pulp wood but of any other wood or timber cut on said concession lands.

We are all impressed with the view that the effect of the contract in question was to clothe the importer with the *nominal* but not the *real* right of unrestricted export of pulp wood, and that the construction thereof claimed by the inporter would result in an evasion of our statute, which is designed to prevent restriction of every kind in the export of pulp wood from Canada and its provinces and gives free entry only to pulp wood and certain of its products when the wood is entitled to unrestricted export. We are unwilling either to adopt such a construction or assent to such a result.

The judgment of the Board of General Appraisers is *reversed*.